QUINN EMANUEL URQUHART & SULLIVAN, LLP
Harry A. Olivar, Jr. (Bar No. 143089)
harryolivar@quinnemanuel.com
David Elihu (Bar No. 303043)
davidelihu@quinnemanuel.com
Alyssa L. Greenberg (Bar No. 305705)
alygreenberg@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Plaintiff*
*Fetch Media, Ltd.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| FETCH MEDIA, LTD., | CASE NO. 4:18-cv-00015 |
| Plaintiff, | **FETCH MEDIA, LTD.'S COMPLAINT FOR DECLARATORY RELIEF** |
| vs. | |
| UBER TECHNOLOGIES, INC., | |
| Defendant. | |

Plaintiff Fetch Media, Ltd. ("Fetch"), by and through its undersigned counsel, brings this action against Defendant Uber Technologies, Inc. ("Uber"), and alleges as follows:

**PRELIMINARY STATEMENT**

1. Fetch brings this action to resolve ongoing contractual disputes with Uber, including Uber's incorrect position that under the parties' agreements Fetch had a duty to personally police all ad fraud from suppliers that provided mobile advertising services on behalf of Uber. Uber initially filed claims seeking to resolve these disputes in this Court. Then, after drawing the Hon. Yvonne Gonzalez Rogers, Uber sought to dismiss those claims and litigate these issues in a state-court forum. Fetch does not believe that Uber can so easily escape federal-court scrutiny of its theories, and has filed this diversity action for declaratory relief.

2. The contractual relationship between Fetch and Uber goes back more than two years. In 2015, Uber hired Fetch, an advertising agency with a flawless reputation, to place mobile advertising for Uber with various suppliers. The parties discussed the industry phenomenon of click fraud or advertising fraud ("ad fraud"), a phenomenon where an advertising supplier seeks credit for installations of an application that actually are attributable to other media sources, or otherwise are not the result of actual clicks by human beings on the supplier's advertising. Fetch suggested tools to Uber that Uber could use to combat ad fraud, and recommended avoiding certain suppliers that presented greater fraud risks (Uber was inconsistent in following this advice). Throughout 2015 and 2016, the parties worked well together, Fetch's advertising successes helped register over 35 million new Uber riders, and Uber gave Fetch the highest possible ratings for its work.

3. Beginning in early 2017, however, Uber suddenly changed its tune. A new team at Uber took charge of the Fetch relationship. Uber pretended it had no prior knowledge of the ad fraud risk the parties had been discussing, and Uber claimed that Fetch had had a duty to prevent all ad fraud with respect to dozens of advertising suppliers, almost all of which are small businesses. Uber inexplicably refused to pay for over $19 million of services that Fetch and the advertising suppliers had provided. Then, after Fetch pressured Uber to pay the amounts it owed, Uber filed a lawsuit in this Court, bringing a contract claim and nine tort and statutory claims against Fetch based on incorrect assertions about the parties' agreements and Fetch's responsibilities to police ad fraud under

those contracts. After the case was assigned to the Hon. Yvonne Gonzalez Rogers and Fetch was put to the expense of filing a motion to dismiss, Uber hastened to dismiss all of its federal-court claims. Uber now seeks to have the parties' disputes about Fetch's contractual obligations resolved in another forum, as part of cross-claims it has filed against Fetch in a state-court action filed by an unpaid supplier.

4. Fetch does not believe that Uber can avoid federal-court scrutiny of its incorrect contract theories so easily. Fetch respectfully requests that the Court interpret the parties' contract and issue a declaration regarding Fetch's and Uber's responsibilities under the parties' contractual relationship. Fetch believes that such a ruling will dispose of Uber's incorrect theories about Fetch's obligation to policies other parties' ad fraud.

**THE PARTIES**

5. Plaintiff Fetch is a U.K. mobile advertising agency with its principal place of business at Tea Building, Unit 3.09, 56 Shoreditch High Street, London, UK E1 6JJ.

6. Defendant Uber is a Delaware corporation with its principal place of business in San Francisco, California.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Fetch and Uber and the amount in controversy exceeds $75,000, exclusive of interests and costs. The Court may grant declaratory relief in this action pursuant to 28 U.S.C. §§ 2201 and 2202.

8. This Court has general personal jurisdiction over Uber because it has its principal place of business in California and therefore resides here. In addition, the Court has personal jurisdiction over Uber because it is bound by a valid forum selection clause. First Amendment to the Services Agreement at **§§** 4, 6.1 (Ex. B).

9. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) and (c)(2) because at all times relevant to this matter, Defendant Uber resided in, and was subject to personal jurisdiction in, this District. Moreover, venue is proper because Uber has consented to venue in this District under the parties' Agreement and, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial

1  part of the events giving rise to the claims occurred in this District, including Uber's filing of its prior
2  related action, *Uber Techs., Inc. v. Fetch Media, Ltd.*, Case No. 4:17-cv-05393-YGR (N.D. Cal.), in
3  this District.

4      10.    For purposes of intra-district assignment under Civil Local Rules 3-2(c)-(d) and 3-5(b),
5  assignment of this action in the San Francisco or Oakland Division is proper.  Pursuant to Civil Local
6  Rules 3-12, Fetch will file an Administrative Motion to Consider Whether Cases Should be Related
7  and request that this case be transferred to the Hon. Yvonne Gonzalez Rogers, who was assigned to
8  Uber's original federal action, Case No. 4:17-cv-05393-YGR (N.D. Cal.), before Uber sought to
9  dismiss those claims.

## UBER'S AND FETCH'S CONTRACT FOR MOBILE ADVERTISING SERVICES

11      11.    Fetch is an industry-leading, award-winning mobile advertising agency.  Fetch arranges
12  for mobile advertising placements for some of the world's most prominent companies including eBay,
13  Expedia, and Facebook.  Fetch is not a provider or seller of advertising space.

14      12.    "Mobile advertising" refers to advertisements that appear on either mobile-optimized
15  websites or in mobile smartphone applications.

16      13.    Uber is a San Francisco-based technology company that developed a smartphone
17  application (the "Uber App") that enables users of the application ("riders") to request ridesharing
18  services from independent, third-party transportation providers ("drivers").

19      14.    Uber relies, in part, on mobile advertising to gain new riders and drivers.  When a
20  potential rider or driver clicks on a mobile advertisement, she is directed to the Apple App Store or
21  Google Play Store where she has the opportunity to download and install the Uber App.

22      15.    Uber engaged Fetch to create and execute a mobile advertising campaign between
23  January 2015 and 2017 (the "Uber Campaign") pursuant to the Services Agreement and related
24  statements of work, amendments, and addenda entered into between the parties (together, the
25  "Agreement").

26      16.    In connection with the Uber Campaign, Uber and Fetch entered into a Services
27  Agreement dated January 29, 2015 and an amendment dated December 22, 2015 (collectively "the
28  Agreement"), true and correct copies of which are attached hereto as **Exhibits A** and **B**.

17. The parties also entered into a number of Statements of Work which further outlined the contours of the parties' relationship. Specifically:

18. Effective January 29, 2015, Uber and Fetch entered into a Statement of Work for 2015 (the "2015 SOW"). A true and correct copy of the 2015 SOW is attached as **Exhibit C**.

19. Effective December 26, 2015, Uber and Fetch entered into a Statement of Work for 2016 (the "2016 SOW"). A true and correct copy of the 2016 SOW is attached as **Exhibit D**.

20. On April 18, 2016, Uber and Fetch entered into an Addendum to the 2016 SOW. A true and correct copy of the Addendum to the 2016 SOW is attached as **Exhibit E**.

21. Effective January 1, 2017, Uber and Fetch entered into a Statement of Work for 2017 (the "2017 SOW"). A true and correct copy of the 2017 SOW is attached as **Exhibit F**.

22. Fetch arranged for Uber's advertisements to appear on mobile advertising spaces, then passed back the cost of purchasing the space to Uber. For example, Fetch would arrange for advertising by Uber on the Twitter social network, which requested that prospective riders and drivers install the Uber App from the Apple App Store or Google Play Store onto their mobile phones. In the course of Uber's advertising campaign, Fetch, acting at the direction of Uber, bought mobile advertising space from dozens of third-party advertising suppliers.

23. The relationship between Uber and Fetch was governed by the contractual terms set out in the Agreement dictating the planning and execution of the campaign, the provision of data performance metrics to Uber, the services to be provided, and performance reporting and reviews.

24. The Agreement required Uber to make payments on a particular schedule, and Uber had to raise disputes over payment or notice of deficiencies in deliverables, if any, pursuant to the procedures set forth in the Agreement.

25. Fetch was paid based on key performance indicators ("KPI"), none of which required Fetch to police or prevent third-party suppliers' ad fraud.

26. In the second half of 2016, Fetch achieved a perfect 9 out of 9 score from Uber on the applicable KPIs, which included both quantitative and qualitative factors, and Fetch was awarded a maximum performance bonus by Uber.

27. Nowhere does the Agreement impose on Fetch the obligation to police the advertising of dozens of third-party advertising suppliers that provided advertising to Uber or otherwise prevent ad fraud.

28. Uber and Fetch never executed a contractual provision delegating the role of detecting ad fraud by third-party suppliers to Fetch.

29. In fact, in late 2016, Uber and Fetch discussed a proposal to amend the parties' contract to pay Fetch more and to make Fetch partially responsible for policing third-party suppliers' ad fraud, but the parties never agreed to or executed the proposed modification.

30. During the course of its relationship with Plaintiff, Uber was a highly valued Fetch customer, and Fetch provided significant value to Uber. Over a relatively short period, Fetch helped Uber register over 35 million new riders.

**UBER'S AND FETCH'S WORK TOGETHER TO LIMIT AND REMEDY AD FRAUD**

31. Throughout their relationship, Uber and Fetch discussed the risk of ad fraud and how Uber could monitor or minimize the risk of it. At Uber's direction, third-party mobile analytics company TUNE, Inc. ("TUNE") gathered tracking and performance data for the mobile advertising being provided for the Uber Campaign.

32. Uber was the contracting party with TUNE, and suppliers entered data into the TUNE platform at the direction of Uber. TUNE, at Uber's direction, presented the suppliers' self-reported data in various ways to assist Uber and Fetch to assess the performance of the Uber Campaign.

33. Uber had full access to the data on the TUNE platform related to the Uber Campaign. Fetch did not. Uber had the ability to limit the amount and type of data that Fetch could access on TUNE, and in fact significantly did so. For example, Uber prevented Fetch from viewing data related to organic installations – installations initiated by word of mouth, or some other form of non-digital advertising.

34. This and other limitations Uber imposed on Fetch's access to TUNE data limited Fetch's, but not Uber's, ability to detect ad fraud.

35. Fetch compiled the data reported to TUNE by third parties, and provided "transparency reports" to Uber so that Uber could evaluate the Uber Campaign.

36. The primary purpose of these reports was to understand on which types of sites Uber's advertisements were running, what categories of advertisements were the most successful, and whether the same advertisement was being run by multiple vendors.

37. As Fetch explained to Uber, ad fraud could not be accurately and efficiently identified through the transparency reports, and that was not their purpose.

38. Uber and Fetch discussed ad fraud at length, including discussion of Uber paying for additional tools to detect and prevent ad fraud, such as those provided by third party Forensiq. Uber declined to use these tools, expressing that it was not interested in Forensiq and other tools to combat fraud, regardless of any increased ad fraud risk.

39. Uber also ignored Fetch's warnings regarding certain high-risk, low-quality suppliers, and continued requesting services from suppliers specifically flagged by Fetch. In several cases, Uber itself began working with suppliers flagged by Fetch.

40. Throughout the Uber Campaign, Uber was aware of, and itself identified, both the possibility of ad fraud and that the advertising that was being provided to it by dozens of third party suppliers might be subject to various levels of ad fraud.

41. Upon information and belief, notwithstanding Fetch's warnings regarding and Uber's awareness of potential ad fraud, Uber's employees working on the Uber Campaign were incentivized to order low-cost, low-quality media spend because of aggressive Uber internal targets regarding rider and driver acquisition, as well as compensation which Uber employees on the Uber Campaign received tied to the amount of mobile media advertising spend.

42. Now that a new team at Uber has become responsible for the Fetch relationship, and Uber is looking for excuses not to pay its bills, Uber is asserting a revisionist version of all of this history. Uber seeks to blame Fetch for the risks it took on, and for responsibilities Fetch never had, advancing an incorrect interpretation of Fetch's responsibilities under the Agreement.

**UBER'S DECISION IN 2017 TO STOP PAYING ITS BILLS**

43. Fetch and Uber worked well together for over two years until January 2017, when a new team at Uber became responsible for the relationship. Members of the new Uber team, apparently looking to increase their stature within the company, began pointing fingers at Fetch and encouraging Uber to begin handling more of its mobile advertising services in-house.

44. All of a sudden, Uber stopped paying its bills for services that had been provided by dozens of suppliers that Fetch had arranged, many of which are small startups.

45. To date, Uber has not paid $19,736,925 of invoices issued by Fetch for services rendered in 2017.

46. To justify its failure to pay material amounts it owed, Uber advanced the new and incorrect theory that Fetch had an obligation under the Agreement to police and prevent ad fraud by third-party suppliers.

**UBER'S ASSERTION OF CLAIMS AGAINST FETCH IN FEDERAL COURT BASED ON INCORRECT ASSERTIONS ABOUT THE PARTIES' CONTRACT**

47. On September 18, 2017, Uber advanced its incorrect theories about the parties' Agreement in a complaint ("Original Federal Complaint") that it filed against Fetch in federal court. In the Original Federal Complaint, Uber sought to excuse its failure to pay its bills by alleging, among other things, that Fetch had breached its contract by failing to police ad fraud. A copy of Uber's Original Federal Complaint is attached hereto as **Exhibit G**. *Uber Techs., Inc. v. Fetch Media, Ltd.*, Case No. 4:17-cv-05393-YGR (N.D. Cal.). Uber included a contract claim and nine purported tort and statutory theories against Fetch in its federal filing.

48. Uber's federal court filing put Fetch to the expense of filing a motion to dismiss and preparing for a case management conference. After the federal action that Uber filed was assigned to the Honorable Yvonne Gonzalez Rogers, Fetch filed a motion to dismiss nine of the ten causes of action in Uber's Original Federal Complaint on December 18, 2017. On December 20, 2017, counsel for Uber and Fetch had a telephonic conference to discuss preparation of the Joint Case Management Conference Statement for a Case Management Conference that Judge Rogers had set for January 8, 2018, and discussed their respective positions on the required topics.

1  Uber's counsel committed to prepare and circulate draft sections of the Joint Case Management

2  Conference Statement regarding factual and legal issues and a case schedule.  The parties also

3  discussed ADR options and preferences as required.

4       49.    After Uber filed its federal action, one of Uber's suppliers, Phunware Inc.

5  ("Phunware") sued Uber in California state court on September 26, 2017 for breach of contract for

6  failure to pay Phunware for advertising services it had provided.  *Phunware, Inc. v. Uber Techs.,*

7  *Inc.*, Case No. CGC-17-561546 (Cal. Sup. Ct.).  On November 13, 2017, Uber filed a Cross-

8  Complaint in the Phunware state court action against Phunware and Fetch.  The Cross-Complaint

9  essentially copied the allegations in Uber's Original Federal Complaint, cutting and pasting much

10 of the text in purported support of six causes of action that Uber asserted against Phunware and in

11 support of twelve causes of action that Uber asserted against Fetch.  On November 21, 2017, Uber

12 filed a notice of related case in the Original Federal Action, noting that it had yet to determine

13 "whether the state court proceeding should be coordinated with [Uber's federal action] to avoid

14 conflicts, conserve resources, and promote an efficient determination of the actions."  On

15 December 18, 2017, Fetch and Phunware jointly moved to stay the state court proceeding pending

16 the decision on Fetch's federal court motion to dismiss.

17 **UBER'S ATTEMPT TO ABANDON ITS CLAIMS BEFORE JUDGE ROGERS IN**
18 **FAVOR OF A STATE-COURT FORUM**

19      50.    On December 22, 2017, two days after the parties' call to prepare for the January 8,

20 2018 case management conference, Uber, without any prior notice to Fetch, filed a notice of

21 voluntary dismissal of the federal action.  That same day, Uber sent a letter to counsel for Fetch

22 and Phunware, making clear that Uber now wished to litigate its theories about Fetch's obligations

23 under the Agreement in a state-court forum, instead of the federal forum it originally selected.

24      51.    A justiciable controversy exists between the parties regarding whether Fetch was

25 contractually obligated under the Agreement to police ad fraud by suppliers.  Fetch submits that a

26 declaratory judgment on this issue will substantially resolve the ongoing disputes between Fetch

27 and Uber.

28

**FIRST CAUSE OF ACTION**
**(Declaratory Relief: No Duty to Police or Prevent Third-Party Suppliers' Ad Fraud)**

52. Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as if fully alleged herein.

53. Uber and Fetch were parties to a valid and binding Agreement. No provision of that Agreement required Fetch to prevent, identify, or remedy fraud in Uber's mobile advertising campaigns. To the contrary, at one point in their relationship, Fetch and Uber discussed modifying the Agreement – to pay Fetch more, and to have Fetch share in that responsibility – but the parties elected not to proceed with the modification.

54. Based on its incorrect assertions about Fetch's responsibilities under the Agreement, Uber now claims that it is not responsible for paying the $19 million it owes to Fetch and suppliers, and that Fetch is instead responsible for refunding millions of dollars in payments that Uber made to mobile advertising suppliers because of Fetch's failure to prevent ad fraud.

55. In light of the foregoing, an actual and justiciable controversy exists between Uber and Fetch based on Uber's recently dismissed complaint concerning whether Fetch owed Uber a duty to police and prevent suppliers' ad fraud and/or to ensure that Uber's mobile advertising was fraud-free, warranting the Court's determination of the issue.

56. Fetch is entitled to a judicial declaration that under the parties' Agreement, Fetch did not owe Uber a duty to police third-party suppliers' ad fraud or to ensure that Uber's mobile advertising was fraud-free.

**SECOND CAUSE OF ACTION**
**(Declaratory Relief: No Basis for Uber to Refuse to Pay Amounts Owed to Fetch and Suppliers)**

57. Plaintiff incorporates by reference each and every allegation in the preceding paragraphs as if fully alleged herein.

58. To date, Uber has failed to pay invoices sent by Fetch for services rendered in 2017 in relation to the Uber Campaign.

59. Uber claims that it does not have to pay the outstanding amounts from the 2017 invoices because the mobile advertising services that third-party suppliers provided to Uber were subject to unspecified levels of ad fraud.

60. Fetch contends that Uber did not timely raise any dispute regarding payment of any invoices, and regardless, ad fraud does not provide Uber a basis to refuse to pay the amounts owed to Fetch and third-party suppliers.

61. In light of the foregoing, an actual and justiciable controversy exists between Uber and Fetch based on whether Uber has a basis to refuse to pay amounts owed to Fetch and third-party suppliers under the Agreement.

62. Fetch is entitled to a judicial declaration that under the parties' Agreement, Uber has no basis to withhold payment of invoices sent by Fetch related to services performed during 2017.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Uber as follows:

That it be declared that Fetch owes no duty under the Agreement to police third-party suppliers' ad fraud or ensure that Uber's mobile advertising was fraud free;

That it be declared that under the parties' Agreement, Uber has no basis to withhold payment of invoices sent by Fetch for services performed during 2017;

That the Court grant Fetch such other relief as it deems just and proper.

DATED: January 2, 2018

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ Harry A. Olivar, Jr.*
Harry A. Olivar, Jr.
*Attorneys for Plaintiff
Fetch Media, Ltd.*